ALBERT J. LINGO, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

[1.] It is not error for the Judge to refuse to have talesmen again called in making up the panel in a criminal cause, after he had ordered the Sheriff to direct each talesman to come into Court, and had had proclamation made, that all talesmen were required to come into Court.

[2.] Threats by the deceased are not admissible in evidence when they were unknown to the slayer, and where the deceased did nothing in the conflict except to defend himself.

[3.] Communications between husband and wife are protected from disclosure, even after the relation has ceased.

[4.] That which is perfectly justifiable on the part of the deceased, cannot be any legal provocation to the slayer.

Murder, in Cobb Superior Court. Tried before Judge RICE, at March Term, 1859.

Albert J. Lingo, the plaintiff in error, was indicted for the murder of Robert Duncan. He pleaded not guilty, and the case came on for trial at March Term, 1859.

In making up the jury, after the first panel of forty-eight had been exhausted, the Judge ordered the Sheriff to summon a second panel of talesmen, and to notify them as he summoned them, to come into Court. The Sheriff, after summoning the requisite number, reported their names to the Judge, who ordered proclamation to be made at the door for all persons thus summoned as tales jurors, to come into Court. The Clerk made out a list of the panel which

was furnished the prisoner's counsel, and called over the names thereon, before the panel was put upon the prisoner. Two of the persons summoned as tales jurors, and whose names were on the list, and numbered thereon 32, and 33, failed to answer when called. The Judge ordered a fine upon them and directed two others to be summoned and put in their places. Counsel for prisoner objected, and requested that the two absent jurors be called at the Court-house door by the Sheriff. This the Court refused to do, and counsel for the prisoner excepted.

The judge remarks, in relation to this exception, that the jury of twelve men, who tried the prisoner, was made up and completed before numbers 32 and 33 on the panel, were reached.

The jury being made up, the following, in substance, was the evidence on the part of the State.

*Elisha H. Lindley* testified, that at Powder Springs, in the county of Cobb, on the 5th August, 1858, he saw prisoner and Robert Duncan, the deceased, at H. J. Hopkins's grocery. When witness got down to the grocery, Duncan came out at a door at the east end of the house, by the side of the chimney, and prisoner came out into the piazza fronting the street; about that time witness stepped into the piazza and Duncan was at the end and attempted to step in and called on witness, to witness that he had been running from prisoner, and that he did not intend to run any more; at that time prisoner made towards Duncan, and witness spoke to him and told him to stop, and that he was about to get into a serious difficulty. Prisoner made no reply, but made at Duncan, who commenced giving back; prisoner continued to press on him; Duncan told him if he rushed on him he would shoot him; made that remark to prisoner several times; prisoner replied, "shoot and be damned, if you do I will kill you." Prisoner had his stick behind him, under his coat tail; Duncan retreated, prisoner pursuing him about thirty yards, when deceased said to him, that if he

followed him three or four steps further (witness does not remember which) he would shoot him; prisoner continued to advance, when Duncan shot at him; both were moving at the time; Duncan retreating and prisoner following, when Duncan shot. Duncan said several times to prisoner, that if he followed him further he would shoot, and prisoner replied to shoot, and be damned. The pistol that deceased had was a small single barrel one, four or five inches long in the barrel. After deceased shot at the prisoner he started and ran as fast as he could, and prisoner ran after him; as prisoner started to run he drew the spear out of the stick which he had in his hand; deceased ran, and prisoner after him, around behind Dr. Reynolds's blacksmith shop, and they then were out of witness's sight. When prisoner drew his spear, and started after deceased, he said "God damn you, I have got you now," or "God damn you, I will have you now." Witness went round behind the shop as soon as he could, and when he reached the parties, deceased had prisoner by the hair with his left hand, and with his right hand had prisoner by the coat collar; prisoner held deceased by the shoulder; they had hold of each other; saw no weapon then in the hands of either; witness took hold of prisoner, and A. J. McCurdy took hold of Duncan, and they tried to pull them apart, but Duncan held on so tight that witness spoke to him several times to let go; we got them loose, and Duncan walked off a few steps and began to reel like a drunken man; witness still held prisoner, and the spear was lying on the ground; witness and prisoner both grabbed at it at the same time, but witness got it; did not see any blood on the spear; Mr. Keser was standing by, and witness asked him to hold prisoner so that he could go and see what was the matter with Duncan; he had fallen down on the ground; witness went up to him and saw that he was dying; witness then said to Keser, that prisoner had killed Duncan; prisoner replid, that he did not care a damn if he had. As Duncan fell, he said, that he was a dead man:

he did not speak while witness and McCurdy were parting them; he did not speak a word that witness heard after he reached them, except that he was a dead man, as before stated; he died in two or three minutes after he and prisoner were parted; afterwards witness, with others, opened deceased's shirt collar and bosom, and found a wound on his left breast a little below the nipple; the wound was small, and looked as if it had been made by the spear (now produced and shown in Court). This spear is the same that witness picked up at the place where Duncan was killed; it is about twelve inches long; deceased was carried into Drs. Cotton and Reynolds's shop; Dr. Reynolds and witness then took the spear and ran it into, or through the hole in deceased's shirt, where the wound was inflicted, to ascertain how far the spear ran into the body of deceased, and it passed about six or eight inches through the hole before it became tight. There was another wound on the body, two or three inches from the one just described, and was more around on the *side*; *it* was a small wound just through the skin. Prisoner *was arrested*; deceased limped a little; one leg had been broken, was a little *shorter* than the other. At the time deceased shot at prisoner they were about 12 or 13 feet apart; prisoner was not hit; saw Drs. Cotton and Reynolds probe the wound; they inserted the probe, and it went in some two or three inches; the wound bled but little externally as far as witness saw; believes that the wound caused Duncan's death.

*Cross-Examined.*—(The defendant's counsel exhibited a diagram, showing the situation of the house, and of the door described by witness.)

When deceased came around to the piazza, he had his pistol in his hand, and when he went to get up into the piazza, prisoner ran out and met him; by rushing towards deceased, witness meant that he walked pretty fast towards him; when prisoner walked towards deceased, deceased gave back; at that time saw no drawn weapon in prisoner's

hand, but he had the stick with the spear in it under his coat tail; at that time prisoner made no effort to strike deceased, for he was not in striking distance, but was ten or twelve feet from him; as deceased retreated prisoner followed, and did not get nearer than 10 or 12 feet up to the time deceased shot at him; when witness saw prisoner come out of the house into the piazza, he seemed very much excited, and seemed to be mad; did not at any time see prisoner attempt to strike deceased, but only saw him running after him with the spear; saw deceased with a stick in his hand, but cannot say whether it was loaded with lead or not; the stick was about the size of the sword cane now shown in Court; thinks it was a hickory stick; deceased was a somewhat heavier man than prisoner; when witness and McCurdy separated them, the hickory stick and the sword cane were both lying on the ground at the same place; about the time that witness first went up to the piazza, he heard prisoner say to deceased, that he, deceased, had ordered prisoner's mother from his, deceased's house; witness has understood that deceased married a daughter of Pinkerton Lingo, and that she was a sister of prisoner; prisoner's mother is the reputed mother of Mrs. Duncan.

*A. J. McCurdy*, on the part of the State, testified in substance, that he was at Powder Springs, on the day that Robert Duncan was killed; saw prisoner about a half an hour before the difficulty in which Duncan was killed; prisoner was in the tenpin ally rolling tenpins; Duncan came in and spoke to all of us who were in the ally, and then turned round and started out, when prisoner spoke to him, and said that he wanted to see him before he left; Duncan replied " very well," and walked off down the street to Mr. Hopkins's grocery; prisoner stopped rolling, and put on his coat and picked up his stick, and walked up to witness and pulled the spear out of the stick four or five inches, and told witness that he allowed to whip that damn rascal (referring to Robert Duncan); wit-

ness told him that he had better not; prisoner then went out, and went down to the grocery; Duncan was then sitting in the piazza; the fuss between prisoner and Duncan then commenced; witness and Elisha Lindly went down and told prisoner that he had better stop, and have no fuss with deceased; prisoner then rushed on, following deceased up, until he came opposite to Mr. Megell's store; as deceased was leaving the grocery, he called on Mr. Lindley and Mr. Hopkins to take notice of what was going to happen; that if prisoner rushed on him he would shoot him; prisoner cursed him and told him to shoot; when deceased got up opposite Megell's store, as above stated, he shot at prisoner; deceased was rather giving back, and prisoner rushing on him at the time; prisoner had his stick (the one now produced in Court) under his coat behind, at the time deceased shot, and as soon as the pistol fired, deceased ran, and prisoner drew the spear out of the stick, drawing it in his right hand, took after deceased; prisoner pursued him around below Dr. Reynolds's shop and overtook him; the parties struck a lick or two with their sticks, and prisoner got deceased round the neck with his left arm, and struck him two licks with the spear; prisoner then threw him, and deceased turned prisoner, and by that time Mr. Lindley and witness got there and parted them; witness took deceased off two or three steps, and deceased asked him to let him get his stick; witness let him go that he might get his stick, and when he let him go, he saw that he was falling, and took hold of him and laid him down on the ground, and he died in about two minutes.

*Henry J. Hopkins*, on the part of the State, testified in substance, that he was setting with Robert Duncan, in the piazza of his, witness's, grocery house; they were talking; prisoner came out of the tenpin ally, and came up to within four or five steps of where witness and Duncan were sitting, and said to Duncan, "let us go and take something to drink;" Duncan replied "no, that he had quit drinking;"

prisoner replied, "the hell you have;" prisoner then said to him, "God damn you, you want to drive my mother off again;" and witness thinks that he then placed his hands behind under his coat, and walked off pretty near to the piazza, and as he came up, Duncan rose up, and as he rose drew his pistol and told prisoner to stop; that he would hurt or shoot him if he rushed on him; prisoner, when he came up had the sword cane in his hand; deceased gave back and retreated into the house, and told prisoner to stand back, and that he would shoot him if he rushed on him; prisoner, with his sword cane in his hands behind him, said, "shoot, God damn you, shoot," and that he "would put six holes through" him; Duncan retreated, and backed out at the back door; after he went out at the back door; prisoner turned and came back through the house into the piazza, and Duncan came round the house, to the end of the piazza; prisoner again made towards him, and deceased gave back, and asked Elisha Lindley to bear witness that if prisoner followed him to Florence & Megell's store house, that he would shoot him; prisoner made no stop, but rushed right on deceased, saying, "shoot, God damn you, shoot," at the same time having his hands behind him under his coat tail; when deceased arrived in front of Florence & Megell's store, which was thirty or forty yards from the place they started from, he rather halted, and prisoner came up within about five steps of him; deceased rather stepped back, and said to prisoner, that if he did not stop he would shoot him; deceased had his pistol in his hand, holding it rather up; prisoner did not seem to stop, and deceased brought his pistol over towards prisoner and fired at him; prisoner all the time saying, "shoot, God damn you, shoot." As soon as deceased fired, he broke and ran, and prisoner, with his sword cane in his hands behind him, pulled out the spear and took after him as fast as he could run, saying, "O God damn you, I will get you now;" they run some fifteen or twenty steps, and got between two houses, where witness

could not see them ; witness went down to where they were, and as he got there Lindley and McCurdy parted them ; deceased could not have gone more than seven or eight steps further in that direction, before coming to a high fence ; there was a gully there, and the parties were near it when they were separated; after they were separated Duncan walked off four or five steps, and dropped down in a little gulley, and died in four or five minutes.

*Cross-Examined.*—Prisoner was not on the steps of the piazza, but out on the ground, when he said to deceased, "you want to drive my mother off again, God damn you ;" did not see prisoner have any pistol; he did not follow deceased quite to the back door, but went near to it; deceased could have gone across to Florence & Megell's store without coming around by the piazza, and it would have been nearer ; deceased had his pistol in his hand when he came round to the end of the piazza ; when he started off to Florence & Megell's store he was cursing the prisoner some, but witness does not recollect the language used ; did not see prisoner draw any weapon, or attempt to strike deceased at any time before deceased shot at him; does not think that prisoner was ten steps from deceased at the time deceased shot at him; after the difficulty, witness saw the fore-finger of one of prisoner's hands, and it looked as if it had been cut or bit; it was bleeding a little ; the finger was hanging by the skin ; when deceased shot at prisoner he rather threw up his hand; don't know which hand ; did not see prisoner with any other weapon than the sword cane.

*Re-examined.*—Thinks that at the time deceased shot at prisoner, he had his hands with his cane behind his back under his coat.

*Daniel Diggs* testified, that the first he knew of the difficulty he heard a fuss, and the next thing a pistol fire, and then deceased and prisoner came running by where he was, and when deceased came near to witness, he turned his

head to look back, and fell full length on his back; there was a little gully there that threw him as he was looking back at prisoner; prisoner then bounced on him with his spear, and stuck it into him about an inch and a half below his left nipple; at the time prisoner stuck his spear into deceased he was lying on his back at full length, with his hands up as if to prevent prisoner from striking him; then deceased and prisoner rose and clinched each other, and then fell and scuffled about over one another; it looked as if deceased was trying to get away from prisoner, while prisoner was holding him; then Mr. McCurdy and Mr. Lindley started to part them, and about the time they took hold of prisoner and deceased, they rose to their feet; after they were parted, deceased walked off three or four steps and fell; they then examined him, and found that he was badly hurt, and was dying; deceased then lay down and died right off.

*Cross Examined.*—Witness had seen prisoner that day in the ally, but had not seen deceased until he saw him running, and the prisoner after him; the first he saw was after the firing of the pistol; saw prisoner stab deceased one time, and then they rose to their feet and clinched; deceased made no attempt to fight; never struck prisoner with a stick; after they rose the last time they knocked one another; witness did not swear before the Coroner, that he "saw prisoner and deceased at the back door of Hopkins's store, and deceased retreating and went to the piazza, and prisoner walked to the front to meet him," &c. Witness also states, that if he swore at the same time, that "Duncan fell in the act of turning," he don't recollect it; did not say in the presence of William Foster and Mathew Lingo, that he knew nothing about the case; neither did he say that he did not see prisoner stick his spear into deceased.

*Martin West,* on the part of the State, testified, in substance, that a few days before the killing he heard prisoner say, in reply to a remark made, that he had better not under-

take to whip Robert Duncan, "that he did not expect to undertake to fight him a fair fight; that he expected to be prepared for him whenever he should meet him;" that in reply to a remark, that it would be something if they went to Marony's and got a whipping; (Marony's was the place where there was to be a shooting match, and where prisoner spoke of going, and expected to meet deceased) prisoner said that he "would whip or kill, or be whipped or killed." Prisoner, on the Sunday evening after this, told witness, "that they had like to have had a right smart show over at Marony's on Saturday evening, and that if the right ones had been there they would have had it; that Duncan was not there, but some of his friends were there, and took up for him," and asked witness when the road working would come on; said that Duncan would be obliged to work the road, and that if he, prisoner, did not work, he wanted to be there any how; saw prisoner's fore-finger before the difficulty, and it looked like it had been mashed in the second joint, and told witness he had got it mashed; thinks it had got well; it was not tied up; it was crooked and looked smaller from the second joint than the other.

*Cross-Examined.*—Does not recollect that prisoner said he expected to meet deceased at the shooting match.

*Pamelia Griggs*, on the part of the State testified, that she was at Pinkerton Lingo's on Monday after the marriage of deceased and Frances Lingo, a daughter of Pinkerton Lingo, and sister of prisoner; prisoner and Matthew Lingo started to Hiram Mosely's, and prisoner took the sword cane, now in Court, in his hands, and said, that on that evening he would take Robert Duncan's heart's blood with that spear, and if he did not do it that evening, he would do it. The next Saturday evening after the above conversation, prisoner came to witness's house, and sat down in the door and sharpened the spear on the razor strop ; same spear now in Court; this was in May, 1858; it was in the spring, and thinks it was in May.

*Cross-Examined.*—Says she is not in a good humor with old Mr. Lingo, but has nothing against the prisoner.

*Archibald P. Griggs*, sworn on the part of the State, says, that about last May, in a conversation with witness about the marriage of his, prisoner's, sister with Robert Duncan; said something about the fuss they had about Duncan trying to bind him over to the peace, and that he had thrown Duncan in the cost; witness then told him that they were done with that, and advised them to quit it and be friendly; told prisoner he thought Duncan had done wrong, yet that his sister might have done worse than to have married him; prisoner replied that he had rather die and go to hell, if there was such a place, than to have it thrown up to him that his sister had married a horse thief; he then drew his spear and said, if Duncan ever crossed his path he would give him the contents of this.

*Cross-Examined.*—When witness spoke of deceased having done wrong, he alluded to his having taken Mr. Kaines's mule.

*Dr. Cotton* testified as to the wounds, and his belief is that it caused his death.

*For the defence, Sarah F. Duncan*, wife of deceased, but whose testimony was excluded, testified, that she was the wife of deceased, and sister of prisoner; she saw deceased load his pistol and shoot at a sapling; thinks it was about two months before his death; saw him shoot it several times; also saw him take a rifle, and follow on after prisoner, as he was passing along the road; this was in April or May, 1858; the rifle was . John Duncan's; deceased borrowed a single barrel shot gun in June, 1858; deceased borrowed a pistol, a revolver, of Allen Parrish, and Marion Duncan took it away, and witness saw it last in John Duncan's chest; deceased was very much displeased when he found that the revolver was gone; he was very angry. On the 4th August, 1858, witness saw deceased when he started to Powder

Lingo vs. The State.

Springs; he carried the single barrel pistol with him; the pistol was loaded; the feelings of deceased towards prisoner were not good.

*Cross-Examined.*—Deceased carried a beef hide to Powder Springs the day he was killed there; he had killed a beef that day.

*Re-examined.*—Joseph Proner and George Proner were with deceased on the 4th August, when he went to the springs; was married to deceased 18th April, 1858, and was living with him at the time of his death.

*Eppey Lingo,* for the defence, testified, that on the 1st July, she went to see her daughter, Sarah F. Duncan, wife of deceased; when deceased came from work he called his wife into the other house, and when she came out she was crying, and deceased cursed witness, and told her to leave his house, and that quickly; witness replied " now Robert, what is the matter? " he said " God damn you, I want you to leave;" witness said to him, that she did not know that it was wrong for her to come to see her child; deceased then cursed Albert Lingo; witness told him that Albert was off attending to his business, and asked him what he had against Albert, and told him that Albert had nothing against him, and wanted to be friendly; deceased said he did not want her to name Albert to him; that he intended to kill him, and had the gun to do it with, and pointed to the gun; he said he was hurrying through his work, and when he got through he intended to kill the whole family; deceased followed witness to the house, and said he intended to kill the first one of the Lingos that passed the road; the road was a neighborhood road; he was a farmer; it was evening, and witness was sick, and told deceased she had a pain in her head, and had had it all day.

*Cross-Examined.*—Deceased married her daughter without the knowledge of the family, and they were not pleased when they heard it, but were willing to pass and be friendly; spoke to deceased when she met him; heard prisoner

say frequently that he wanted to be friendly with deceased, and she never heard him speak of him but in a friendly way.

The foregoing is the most material part of the testimony; other witnesses were examined, but it is deemed unnecessary to insert their evidence, as the facts of the case and points adjudicated, will be sufficiently understood from the above.

The jury found the defendant guilty, and his counsel moved for a new trial on the following grounds:

1st. Because the verdict is contrary to law.

2d. Because the verdict is contrary to the evidence.

3d Because the jury found contrary to the charge of the Court.

4th. Because the Court erred in rejecting the testimony of Mrs. Sarah F. Duncan, the wife of deceased, going to show the declarations of deceased made to her, in connection with; and at the time of the acts sworn to by her.

5th. Because the Court erred in rejecting the evidence of Mrs. Duncan, the wife of deceased, going to show threats and declarations made by deceased to her.

6th & 7th. Because the Court erred in not ordering, or allowing the Sheriff to call the two absent tales jurors who had been summoned by him, as before fully stated.

The Court refused, and overruled the motion for a new trial, and in relation to the 4th and 5th grounds, states that the evidence of deceased's wife, as to the sayings and declarations of deceased, was rejected because it appeared that they were made in conversation between deceased and his wife while the relation of husband and wife existed, and while they were living together as husband and wife.

To which decision overruling the motion for a new trial, counsel for defendant excepts, and assigns the same as error.

SIMMS & LOCHRANE, for plaintiff in error.

Solicitor General PHILLIPS, contra.

Lingo vs. The State.

*By the Court.*—STEPHENS J. delivering the opinion.

[1.] We do not think there was error in the constitution of the jury in this case. When the Sheriff had been ordered to give each talesman notice to come into Court as he summoned them, and then proclamation had been made at the door, that all talesmen were required to walk into Court; we think sufficient effort had been used to secure the pressence of those who had been summoned. Besides, the prisoner had no right to have any particular persons on the panel. A complete panel of men who were all present, was the one put on him.

[2.] We think the evidence of Mrs. Duncan, respecting what her husband, the deceased, had said to her in the way of previous threats against the prisoner, was properly rejected, for two reasons. In the first place it was inapplicable to the case. There was no single act in the whole drama of the killing that could have been illustrated or modified by it. It was not proposed to show that these threats had been made known to Lingo. That would be a different case. How far these threats would have justified, or palliated his act, if he had acted on a knowledge of them, is one question; but it is a very different one where he knew nothing of them, and where the circumstances of the killing were such as to render it immaterial whether Duncan had made threats or not. Threats or no threats, he had a right to defend himself, and that was all he did. In the second place, this evidence was to be drawn from an illegal *source*, the *wife*, who was such when the declarations were made to her. The husband was dead, and so it is true that the relation had ceased when the testimony was offered; but communications between husband and wife are protected *forever*. This is necessary to the preservation of that perfect confidence and trust which should characterize and bless the relation of man and wife. Each must feel that the other is a safe and sacred depository of all secrets. And the protection

which the law holds over the dead, is the very source of greatest security to all the living.

[3.] But it is said the verdict was contrary to law and evidence, because the killing in this case was not murder. We are constrained to say that it *was* murder, long planned, and deliberately perpetrated murder. Lingo had declared he would have Duncan's heart's blood; at the time of the killing he commenced a quarrel and rushed on him; Duncan retreated, and warned him not to pursue; he did pursue with his hands behind him, and Duncan still retreated, and warned him several times that he would shoot him if he persisted in the pursuit; he did persist, and Duncan did shoot. The shot took no effect, and Duncan then fled, and Lingo exclaimed "now damn you, I've got you." He then pursued till he overtook Duncan, and plunged a spear into his heart. Most literally and fearfully did he accomplish his threat. Where is anything to justify this act, or to reduce it one shade below the crime of murder? It was admitted in the argument, that there was no provocation for the commencement of the attack, but it was suggested that the killing was induced by a provocation arising in the conflict; that Duncan's shooting at him was a provocation, that he did not begin the assault with an intent to kill, but only to whip, and that the intent to kill did not arise till the shooting had furnished an excuse for it. The fallacy in this argument lies in assuming that Duncan's shooting was any provocation at all. It was justifiable shooting. Whether Lingo had before that, intended to kill or not, he had at least tried to make Duncan *believe* that such was his intention, for he declared afterwards, that he had held his hands behind him to make Duncan believe he had a pistol. There was certainly ground to excite the fears of a reasonable man, and this was enough to justify Duncan in shooting. Lingo had himself rendered the shooting necessary to Duncan's self-defence; he had *intentionally* put himself in an attitude which forced Duncan to believe that his life was

in danger.   All that Duncan did was entirely justifiable, and could not, for that reason, be any *provocation*.   But the case does not rest here.   His own declaration above quoted, shows that his intent to kill had been formed *before* Duncan shot.   For what reason did he wish to make Duncan believe he had a pistol?   It was in the expectation that he would shoot, and with the hope of destroying his aim, by putting him under terror.   He proceeded with great nerve and skill.   He counted upon his antagonist missing his aim, and being then in his power.   He had the nerve to take the hazard, and the skill to render it harmless to himself.   But why take this hazard?   It was to get his victim in his power, and the use which he intended to make of his power is best shown by the use he did make of it.

Judgment affirmed.