JOHNSON *vs.* THE STATE OF GEORGIA.

1. Where it appeared that one accused of murder had been accosted by the brother of the deceased, and was the aggressor in a series of altercations which culminated in a deadly struggle between the two, during which the accused wrested his antagonist's pistol from him, and fired a shot or two over his head or at him, when the deceased ran up from the store of his brother to the scene of the fight, and as he approached, the accused turned the pistol upon him, and shot him down, and then turned it again upon his former antagonist, such facts should not have been left entirely unnoticed in charging upon the subject of reasonable fears, and an omission to charge concerning them will require a new trial, although the law of reasonable fears, as between man and man, was properly and clearly given. If the facts and circumstances surrounding the accused were such as to excite the fears of a reasonable man that a joint felonious assault was being made upon him, the verdict should be justifiable homicide; it should be voluntary manslaughter, if they were such only as to excite the fears of a reasonable man that some bodily harm, less than a felony, was imminent and impending; it should be murder, if the circumstances were not such as to excite the fears of a reasonable man that he was in any serious danger at all.

2. It was admissible to prove the remark of deceased, as he left the store, as a part of his act in going to the scene of the contest.

3. The dying declarations proved were admissible, as qualified and guarded by the charge; but perhaps it would have been better to have guarded more clearly the words, "whether such death was approaching fast or slow;" and the dying declarations, being merely cumulative, might be dispensed with entirely.

April 15, 1884.

Criminal law. Murder. Manslaughter. Reasonable Fears. Evidence. Dying Declarations. Before Judge BOWER. Dougherty Superior Court. October Term, 1883.

R. M. Johnson was indicted for the murder of John Cooper. On the trial, the evidence for the state was, in brief, as follows:

Joseph W. Cooper, the brother of the deceased, had had a misunderstanding with the defendant in regard to the right to sell soda water at a barbecue conducted by one Marshall Merritt, colored. Cooper claimed that Merritt had

granted him the right to sell soda water there, and that, just as he was preparing to go, he received a note purporting to come from Merritt, stating that he had previously granted the right to defendant, and requesting him not to bring his soda fountain to the place.   Cooper was very indignant at this, and expressed himself in unmeasured and indecent language.   Some two or three weeks afterwards, Cooper met defendant at the store of one Shackelford in Albany.   This store was located near a store kept by Cooper, and in which his brother, the deceased, clerked. A little further on was a store kept by one Ratliff.   Cooper had sent defendant word to stop and see him as he went home, and defendant, for that reason, had a pistol in his pocket.  Cooper showed the defendant the note, and asked if the latter wrote it.   Defendant pulled it out of his hand, tore it in two, and said that he did not know whether he wrote it or not.   Cooper said, "You don't know your own handwriting?"   Defendant then denied it, and said that, if Cooper would go with him to the store of Ratliff, he would prove it.   They started to Ratliff's, and on the way other abusive language was passed between them.   Cooper testified that on the way, defendant said that he did write the note, and was "man enough to stand up to it;" that he (Cooper) said, "Any God-damned man that would forge a note on a negro is a scoundrel, and as mean as a dog, and is not honest;" that defendant said he would not stand that; that Cooper replied, "I don't care whether you do or not;" that defendant whirled round, put his hand in his pistol pocket, and pulled out his pistol; that Cooper pulled out his also; that defendant said, "You draw your pistol on me?" to which Cooper replied, "Yes, you drawed yours;" that defendant invited him to go down to the river and fight it out; that Cooper said, "Here is the place," and that they would fight it out there; that they started on again; that defendant whirled and caught Cooper with his hand; that Cooper struck defendant with his hand, kicked him, and struck him with his pistol, which

defendant grabbed and wrenched from him, and saying,. " You had the advantage of me, but I have got you now," stepped back and commenced firing; and that he fired the first shot nearly straight up, and the second a little lower. The other witnesses for the state testified that the parties started from Shackelford's to Ratliff's; that Cooper stopped on the road, stooped on the ground, and said, " Here is the place to fight it out; " that he struck at defendant with the pistol, slapped and kicked him, that defendant wrenched the pistol from his hand, and began firing at him. They did not see any pistol in the hands of defendant until he took the one from Cooper. About the time of the first or second shot, the deceased, the brother of Cooper, came from the store towards the place of the difficulty, going rather in the direction of his brother than of the defendant. He said, " Joe, stop your damned foolishness, and come back in the store." Defendant turned and shot him, and then turned and fired at Cooper, his original antagonist, wounding him. Deceased was in his shirt sleeves, and no weapon was seen about him. As defendant was preparing to fire again, one Jones caught him, and one Pinson, who was a connection of defendant by marriage, persuaded him to go to Ratliff's store. Joe Cooper grabbed a pistol from the hand of a negro near by, and snapped it towards defendant. He testified that he had been drinking some, but was not drunk; that defendant was cursing him from the front of Ratliff's store when he snapped the pistol at him; that he (Cooper) did not draw a knife, and had none during the difficulty. The negro, from whom he said he obtained the pistol, testified that it was out of repair; that he had it in his hand because he heard it was against the law to carry it hidden; that he was employed by Cooper, and was crying to think he was shot; that Joe Cooper snatched the pistol from his hand near the door of Ratliff's store, and went over to Ratliff's, and snapped several times towards defendant.

When the deceased started from the store to the place of

the difficulty, he asked a person in there to remain until he came back, and said he was going to bring Joe Cooper back.

Dying declarations were shown, which were proved by a witness substantially as follows:

*W. B. Bennett* sworn, said: John Cooper is dead; I was with him the day before he died; he talked sensible to me Sunday morning; he said he would never get over it; he died on Monday morning, and that was Sunday morning before sun-up; I asked him how it occurred, and he told me that somebody told him that Joe Cooper and defendant were having a difficulty, and he ran out there, and told Joe to stop his damned foolishness, and come in and attend to his business, and he said he turned his side to defendant, and defendant shot him. He said defendant had fired two shots then; the third shot hit him, and the fourth shot hit Joe. He said he took no part in the fuss, only to tell Joe to stop his damned foolishness, and come into the house. He did not say what he had. He said he run out in his shirt sleeves.

The evidence for the defendant was, in brief, as follows:

Threats made by Joe Cooper were communicated to defendant, and he was told that the Coopers were very angry about the note; and he said before going to town, that he supposed the Cooper boys were going to " tackle him." His brother asked him what about. He said about some foolishness, and that there would be nothing of it; that it was about a note, and the Coopers said they were going to kick him, if he came to town that evening. He went; was met by Joe Cooper at Shackelford's store; they started to Ratliff's to settle the question as to the writing of the note. Cooper stopped on the way; said that was the place to settle it; called defendant a God-damned coward; told him he was afraid to draw his pistol, and pulled out his own, defendant having his hand in his pocket. Defendant said, " I will give up; you have got the advantage of me." Cooper slapped defendant with his pistol. Defendant

threw up his hand, grabbed the pistol, took it from Cooper, stepped back, and fired on him. The deceased, John Cooper, who was a brother of Joe Cooper, came running up with a pistol in his hand. The defendant fired upon him, and then again fired upon Joe Cooper, and ran into Ratliff's. Joe Cooper grabbed the pistol from his brother's hand as the latter fell, and snapped it at defendant as he ran into the store.

A witness for the defendant testified that the negro, who swore that the pistol last snapped at defendant was obtained from him, had previously told the witness that Joe Cooper did not get a pistol from him during the difficulty.

The note about which the controversy arose was, in fact, written by one Jordan Merritt, a son of Marshall Merritt; and he signed his father's name because he was at the head of the enterprise, and the father had told him to sign his name whenever he wanted to.

The jury found the defendant guilty of voluntary manslaughter. He moved for a new trial, on substantially the following grounds :

(1.) Because the verdict was contrary to law and evidence.

(2.) Because the court refused to allow defendant's attorney to ask B. T. Jones, a witness for the state, whether he had not had a difficulty with Jim Johnson, a brother of defendant, and whether it made the witness have hard feelings toward defendant.

(3.) Because the court admitted in evidence, over the objection of defendant's counsel, the dying declarations of John Cooper, the deceased, the only evidence of his knowledge that he was in the "article of death" being that of W. B. Bennett (and any other evidence that there is in the brief of evidence on this subject), who testified: "I was with the deceased, John Cooper, the day before he died. He talked very sensibly to me Sunday morning. I was talking to him about being shot, and I asked him how it happened. He said he would never get over it.

He died Monday morning, and this was between daylight and sun-up Sunday morning. I asked him how it oc. curred, and he told me that somebody told him that Joe and Johnson were having a difficulty out there, and he went out there when it occurred, and told Joe to stop his damned foolishness, and come in the house and attend to his business; and he said he turned his side to him, and Johnson shot him. He said Johnson had shot two shots then; and he said the third shot hit him, and the fourth shot his brother, Joe Cooper. He said he took no part in the difficulty, only he run to tell Joe to stop his damned foolishness, and come into the house. He did not make any statement as to what he heard. He said he run out in his shirt sleeves."—Objected to because not admissible under the evidence as dying declarations; and that they were illegal in going beyond "showing the cause of the death and the person who committed the act," by going into the details of the difficulty, and the evidence of Dr. Hilsman, showing he did not think he was going to die on said Sunday morning.

[Note by the court: "Approved as true, except as to the argument and conclusions of movant."]

(4.) Because the court refused to let the defendant prove by Henry Johnson, that the defendant had been put on notice by one Crawford Merritt, the morning of the difficulty, that if he came to town that day, there would be an a—se kicking; and in holding that "the witness, Henry Johnson, might be biased, and may not state it right —he may make a mistake;"—said Merritt having denied giving said notice after being put on the stand by defendant, and defendant wishing to show by the witness that he did get the information from Merritt; and the court erred in ruling, "I will reject the testimony for any purpose except to impeach the witness. I will allow it only in the way of impeachment of the witness."

[Note by the court: "Approved as true, only so far as it states that the evidence was rejected as hearsay, except

as impeaching testimony of the witness, Crawford Merritt, whose sayings were sought to be proved. The court did not hold that the witness, Henry Johnson, was biased, etc., but merely stated that evidence of this character should be rejected for reason of that character; besides the sayings of defendant showing same facts were admitted."]

(5.) Because the court refused to let defendant's counsel ask the witness, Henry Johnson, introduced by the defendant, the following question: "This conversation Mr. Walters asked you about, when you were coming on to town with Bob Johnson, state what he said about what had been told him, and about what he had heard the Coopers were going to do to him; state all that was said to you by Johnson, as to what he had heard the Coopers were going to do to him." On objection of state's counsel, because a leading and direct question, the court erred in ruling. "I think it is leading. You can ask him the whole conversation."

[Note by the court: "This ground is substantially correct, as will appear by the brief of evidence; the whole conversation was allowed to be stated, and was stated. Defendant's counsel were merely prevented from asking leading questions, and when the witness paused, they were allowed to ask what else did he say, etc."]

(6.) Because the court allowed the state to prove by the witness, H. W. Bourne, over the objection of defendant's counsel, that the same was illegal, and made out of the presence of defendant, that John Cooper said, when he was going out the store, at the time of difficulty, that "he was going out to bring Joe Cooper back."

(7.) Because the charge of the court is inapplicable to the law and facts in this case, in this: that it totally failed to refer to the right of the defendant to defend himself against the brother of Joe Cooper (to-wit: John Cooper), Joe Cooper being the one with whom the difficulty was pending when John Cooper came up. The court, instead of charging as it did on that point, as set out in said charge,

should have further charged, that if defendant was engaged in a difficulty with Joe Cooper, under which he would have been justifiable for killing him under the rules given, and the brother of Joe Cooper, John Cooper, pending that difficulty, and you are satisfied from the evidence in the case that defendant had such fears as before charged you, and that the defendant believed, or had reason to believe, that John Cooper came to assist his brother, under the circumstances before given you in charge, then you should acquit the defendant, or the idea embraced in this point. This should have been given the jury in charge, so the jury might understand the rights of the defendant in this case as against one who might have manifestly have intended to aid his brother who was in the wrong.

[Note by the court: "Disapproved as untrue, being merely the inferences, conclusions and argument of defendant or his counsel."]

(8.) Because the court erred in charging: "Under this bill of indictment, the finding of the jury can be one of several verdicts, to-wit: 1st, the general verdict of not guilty; 2d, the general verdict of guilty, which would mean, guilty of the offense of murder; or 3d, a verdict of guilty and recommendation by the jury of imprisonment for life, as the punishment; 4th, or, you may find defendant guilty of voluntary manslaughter;" in connection with which he gave the following: "In this trial, the jury are the judges of the law and facts in the case. This does not mean that the jury can make law, or pervert, or misconstrue law wilfully. They are bound by the law as it is written in the law books, and given them in charge by the court, as far as given in charge. These are the means, and only means, by which they are to learn what the law is. And after thus learning what the law is, the jury are to judge of its application to the case, and its effect, in view and connection with the evidence in the case, keeping in view that all the law applicable to every phase of the case may not always be given in charge."

[Note by the court: "Disapproved as incorrect. It does not correctly state the connection in which the charge on the subject of juries being judges of the law was given. That portion of the charge followed immediately after the following, to-wit: 'You will be governed by the law and evidence in this case in determining which of the above stated verdicts you will find.' "]

(9.) The court erred in charging, after reading sections 4319, 4320, 4321, 4322, 4323, 4324, 4325, 4326, and from 4330 to 4335, inclusive, of the Code, as follows: "When the killing is proved to have been done by defendant, malice is presumed, etc., " as set out in the general charge below, down to and including the words " malice, may also be implied from a wanton and reckless use of deadly weapons, and a trifling with human life;" and then left that portion of his charge, and proceeded immediately to another distinct part of his charge, to-wit: "dying declarations," and charging the jury as follows on that subject: " Dying declarations are admissible in evidence when it appears that the person making them was conscious of his impending death, and when made in the article of death, whether such death was approaching slow or fast," etc., which are claimed as errors, because unwarranted by the evidence and contrary to law ; and the court spoke of them as dying declarations of the deceased, and put them before the jury as *prima facie* evidence as such; and after calling the jury's attention to the " article of death," added: " Whether such death was approaching slow or fast "—stating that the court had admitted them as such dying declarations *prima facie*, there being no other evidence than· that on which the court did admit them ; and he failed to call the attention of the jury to the character and weight of such evidence, or what facts could be proved by such declarations, whether they were utterances consciously made in the article of death, when the hope of life was extinct, and that the sole purpose of such evidence was to prove the cause of the death and

who committed the act—that it was only admitted as a matter of necessity in the absence of higher and better evidence; and also failed to charge the jury that such evidence should be closely scrutinized, especially as to the condition of deceased's mind, and as to whether it was a partial or full statement, whether biased or unbiased.

[Note by the court: "Approved as true, only so far as it gives and states that portion of the charge given on the subject of malice and dying declarations. There was no request made to give any further explanation of the subject of malice, and it is not true that ' I, left that portion of my charge and proceeded immediately to another distinct part;' but I continued my charge as I had it written. There was no request to amplify the charge on the subject of dying declarations, and the conclusions and inferences stated in this ground, are not certified to as true."]

(10.) Because the court erred in his charge on the subject of reasonable fears, as set out in the charge below.

(11.) Because of the following charge of the court: "The evidence to warrant a conviction should be of that satisfactory and conclusive character that excludes reasonable doubt of the defendant's guilt of the offense he is found guilty of, and he is entitled to the benefit of such reasonable doubt, if such exist, in regard to the offense being murder, for the purpose of reducing it to manslaughter, and of such reasonable doubt of the offense being manslaughter to an acquittal. A reasonable doubt is such a doubt as a reasonable man would entertain after a careful consideration of a matter of important concern to himself, that prevents his coming to any satisfactory and definite conclusion in regard to the same."—Objected to because too meagre and restricted to give the jury full liberty to apply reasonable doubt to each and all the material points in the case necessary to constitute the offense charged, they being restricted as to reasonable doubt as to murder or manslaughter, and it did not apply as to whether John Cooper

intended to aid or assist his brother in the difficulty pending, or make a felonious attack himself on defendant; nor did it authorize the jury to exercise its right as to reasonable doubt in weighing the evidence, or in coming to the conclusion of the intention of the parties by their acts, or whether he acted under the fears of a reasonable man or not.

[Note by the court: "Approved as true only so far as it gives a copy of that portion of the charge set out in this ground. The argument and conclusions stated in this ground are not certified as true, and no request to amplify this part of the charge was given."]

(12.) Because of newly discovered evidence.

The charge of the court, omitting that part as to conflicting and impeaching testimony, the weight of evidence, and the form of the verdict was as follows:

"Under this bill of indictment, the finding of the jury can be one of several verdicts, to-wit: 1st, the general verdict of not guilty; or, 2d, the general verdict of guilty, which would mean guilty of the offense of murder; or, 3d, a verdict of guilty and recommendation by the jury of imprisonment for life as the punishment; or, 4th, you may find the defendant guilty of voluntary manslaughter.

"You will be governed by the law and evidence in this case in determining which of the above stated verdicts you will find.

"In this trial, the jury are the judges of the law and facts in the case. This does not mean that the jury can make law, or pervert or misconstrue law wilfully. They are bound by the law as it is written in the law books, and given them in charge by the court as far as given in charge. This is the means, and the only means, by which they are to learn what the law is, and after thus learning what the law is, the jury are to judge of its application to the case, and its effect, in view and in connection with the evidence in the case, keeping in view that all the law applicable to every phase of the case may not always be given in charge.

"In order to enable you to determine what verdict you will find under the law and evidence in this case, it will be necessary for you to know what is the law in the case—what in law amounts to justifiable homicide, what to murder, and what to manslaughter, and other rules of law by which you should be governed in determining your verdict. I will proceed to give you the law in charge, first by reading to you sections 4319, 4320, 4321, 4322, 4323, 4324, 4325, 4326, 4330, 4331,

v 72-45

4332, 4333, 4334, 4335. When the killing is proved to have been done by defendant, malice is presumed, and he should be found guilty of murder, unless the proof discloses such facts and circumstances as will reduce the killing from murder to manslaughter, or show it to be justifiable. It is not necessary that there should be any actual personal ill-will by defendant towards deceased to constitute the malice that would make the offense murder. Nor would every killing by one who had ill-will against the one killed amount to murder, but each case would depend upon the facts and circumstances proved under which the killing was done. Malice may be implied where no considerable provocation appears, and where all the circumstances show an abandoned and malignant heart. Malice may also be implied where it appears from the evidence that there was no necessity at the time for the killing, and the facts and circumstances were not such as to excite the fears of a reasonable man that a serious personal injury was about to be inflicted upon him, or that the person doing the killing did not really act under the influence of those fears, but in a spirit of revenge. Malice may also be implied from a wanton and reckless use of deadly weapons and a trifling with human life.

"Dying declarations are admissible in evidence when it appears that the person making them was conscious of his impending death, and where made in the article of death, whether such death was approaching slow or fast. The court, after hearing evidence upon the subject of the person's consciousness of his condition, and upon the question of approaching death, has admitted, *prima facie*, before you in this case, the dying declaration of John Cooper. It is now for you to determine first whether the evidence sufficiently showed that he was conscious of his approaching death, and that his death was really approaching, to authorize the admission of said declaration, and if not, you should disregard the dying declaration altogether; but if you think such evidence was sufficient for the introduction of such declaration under the rules, as I have given you, you should then consider such declaration as evidence in the case, together with the other evidence. * * *

" The fears of a reasonable man don't mean the fears of a coward, but of a man reasonably courageous, reasonably self-possessed.

(Read section 4331.) "The offense meant to be the subject of the fears of defendant under this section are two-fold. The one meant for your consideration in determining whether the offense is murder or manslaughter, is the offense and fear of committing a serious personal injury, not amounting to a felony, by the person killed on the person doing the killing. And the one meant for consideration in determining whether your verdict should be manslaughter or justifiable homicide, is the offense and fear of the person killed committing by violence or surprise a felony on the person doing the killing. A felony is an offense punishable by law, either by imprisonment in

the penitentiary or by death. All other offenses are misdemeanors, and not felonies.

"To illustrate: If a person were to attempt a serious personal injury upon another with his hands and without a weapon, usually this would not be a felony. On the other hand, if a person attempt to commit a serious injury upon the person of another with a weapon likely to produce death, or without such weapon, under circumstances that actually endanger the life of the other, with intent to kill, usually it would be a felony. It is important, in determining whether your verdict should be murder, manslaughter, or justifiable homicide, that you should consider and determine whether the offense the defendant acted in fear of, if any, was a felony or not. And if the evidence shows that there was an attempt to commit a serious injury on the person doing the killing, amounting to a felony or not amounting to a felony, it must also appear that the defendant really acted under the influence of those fears, and not in a spirit of revenge. And if the evidence shows that there was an attempt by the person killed to commit an injury on the person doing the killing, not amounting to a felony, and the person doing the killing did not act under the influence of any fears of such injury, but in a spirit of revenge, he would be guilty of murder. But if there was an attempt by the party killed to commit a serious injury on the person doing the killing, which did not amount to a felony, and even if defendant did not act under a fear of such offense, if the circumstances were such as to justify and arouse or excite the passion of the person doing the killing, and to exclude all idea of deliberation or malice, either expressed or implied, so that the killing was the result of that sudden violent impulse of passion, the defendant would not be justifiable, nor would he be guilty of murder, but it would be voluntary manslaughter. And further, the bare fear of either of the offenses of committing a personal injury by the person killed on the person killing, would not be sufficient to justify the killing. The facts and circumstances at the time of the killing, as shown by the evidence, must have been sufficient to have excited the fears of a reasonable man that a bodily injury, amounting to a felony, was about to be inflicted on him, to have justified the killing on the one hand; and on the other, that the circumstances were sufficient to excite the fears of a reasonable man, that a bodily injury, not amounting to a felony, was about to be inflicted on him, to reduce the killing from murder to manslaughter. It would be no excuse for the killing that the defendant acted under such fears, unless the evidence shows that the circumstances were sufficient to excite the fears of a reasonable man. There must be a reason shown by the evidence for the fears of a reasonable man. Fears without a reason, and the fears of a coward, are not the fears of a reasonable man, and are no excuse for killing. On the other hand, if the circumstances, as proved by the evidence, were sufficient to excite the fears of a reasonable man

that a felony was about to be committed on him by the person killed, and it appears that the defendant really acted under the influence of those fears in doing the killing, and not in a spirit of revenge, he would be justifiable, whether in fact there was any real danger or not; or, if the circumstances proved were sufficient to excite the fears of a reasonable man that ᴀ bodily injury, less than a felony, was about to be inflicted on him by the p᷑rson killed, and that he acted under the influence of those fears in doing the killing, and not in a spirit of revenge, the killing would be reduced from murder to manslaughter, whether the party doing the killing was in any actual danger at the time or not.

" To make a necessity for killing another in self-defence an excuse for the killing, it must be a present necessity, a necessity at the time of the killing; previous danger that had passed over, and did not exist at the time of the killing, would be no excuse. The necessity for the killing in self-defence must not be provoked and brought about by the unlawful and violent act of the party doing the killing. If one unlawfully provokes, brings about and forces an attack from another that endangers the person so provoking and bringing about such attack, such danger or necessity for killing the attacking party would be no excuse for killing him.

"In determining whether or not the circumstances were sufficient at the time of the killing to excite the fears of a reasonable man, either that a felony, or an offense less than a felony, was about to be inflicted by the party killed on the person doing the killing; or whether or not the defendant acted under the influence of those fears, or in a spirit of revenge; or whether or not there was a necessity for killing in self-defence existing at the time of the killing; or whether the circumstances were sufficient to cause a reasonable man to believe that such necessity existed; and whether defendant really, in good faith, acted under the influence of such belief in doing the killing, you will consider all the facts and circumstances given in evidence in the case; consider the position of all the parties present, who was armed and who not, the conduct of the parties at the time or before and afterwards, so far as will afford you any light; the object of the parties being present; their intentions and acts, so far as you can arrive at them from the evidence in the case. If, after a careful consideration of the evidence and law of the case, you should believe that the defendant killed John Cooper, as alleged in the bill of indictment, and at the time of the killing the circumstances were not sufficient to excite the fears of a reasonable man that John Cooper was attempting to commit a serious personal injury on defendant, and that there was no necessity for the killing to prevent such injury, but that it was done in a spirit of revenge, you should find the defendant guilty of murder.

"If you believe from the evidence that the circumstances were not

sufficient to excite the fears of a reasonable man that John Cooper was manifestly intending and endeavoring, by violence or surprise, to commit a felony on the person of defendant, but were sufficient to excite the fears of a reasonable man that John Cooper was attempting to commit a serious personal injury, not amounting to a felony, on defendant at the time of the killing, and that the defendant really acted under the influence of those fears in doing the killing, and that there was no other provocation for such killing, you should find him guilty of voluntary manslaughter.''

D. H. Pope; G. J. Wright, for plaintiff in error, cited on second ground, Code, §3576; on fourth ground, 18 *Ga.*, 194; on seventh ground, 18 *Ga.*, 704; on eighth ground, 56 *Ga.*, 64; 18 *Il.*, 230, 231; 40 *Id.*, 693; 41 *Id.*, 219; Code, §§4646, 5018; on tenth ground, 61 *Ga.*, 635; 58 *Id.*, 595; 67 *Id.*, 767; 12 *Id.*, 213; 68 *Id.*, 698; 14 *Id.*, 55, 66; on third and ninth grounds, *Mitchell vs. State*, (71 *Ga.*, 128); Code, §3781.

C. Anderson, attorney general; J. W. Walters, solicitor general; W. T. Jones, for the state, cited Code, §3876; 9 *Ga.*, 121; Code, §3781; 41 *Ga.*, 484; 56 *Id.*, 236; 61 *Id.*, 192; 62 *Il.*, 58; 36 Am. R., 257; 26 *Id.*, 48; 41 *Ga.*, 217; 42 *Id.*, 9; 53 *Id*, 432-3; 56 *Id.*, 61-4; Code, §§4321-2; 11 *Ga.*, 615; 3 Kelly, 324; 26 *Ga.*, 207; 35 *Id.*, 75, 59; 50 *Id.*, 556; 41 *Id.*, 484; Code, §4331 22 *Ga.*, 76. 25 *Id.*, 527; 31 *Id.*, 167; 57 *Id.*, 184 Code, §3749; 6 *Ga.*, 276; 33 *Id.*, 268; 38 *Id.*, 508 48 *Id.*, 66; 63 *Id.*, 601; Code, §3716; 55 *Ga.*, 163 59 *Id.*, 856; 61 *Id.*, 300; 34 *Id.*, 110; 31 *Id.*, 672; 61 *Id.*, 258; 12 Ala., 764; 127 Mass., 455; 2 Br. Cr. Cas., 93; 1 Greenl. Ev., §§159, 161 *a*; 67 *Ga.*, 460 and cit.; 40 *Id.*, 693; 49 *Id.*, 485; 50 *Id.*, 560; 59 *Id.*, 232; 26 *Id.*, 192; 6 *Id.*, 348; 53 *Id.*, 368; 59 *Id.*, 63; 6 *Id.*, 276; 33 *Id.*, 4; Code, §§4320, 4336.

Jackson, Chief Justice.

1. On a careful examination of the charge of the court, and the exceptions thereto specified in the motion for a

new trial, read in connection with the whole charge and construed therewith, we find but a single error which, in our judgment, requires the grant of a new trial. That is the omission of the court of all allusion to the rencounter of defendant with J. W. Cooper, the brother of deceased, with whom defendant was engaged when deceased ran up to the place of combat. It appears that the accused had been accosted by the brother of deceased, and was the aggressor in a series of altercations which culminated in a deadly struggle between the two, during which the accused wrested his antagonist's pistol from him, and fired a shot or two over his head or at him, when the deceased ran up from the store of his brother to the scene of the fight. As he approached, the accused turned the pistol upon him, and shot him down, and then turned it again upon his former antagonist and wounded him.

We think that the true legal question for the jury was, whether the accused was actuated by the fears of a reasonable man that, when deceased ran up to the scene of the conflict, he was armed, and came there for the purpose of joining in the *melee*, supporting his brother in the fight, and whether he really apprehended that his own life or person was thus exposed to a felonious attack, and had reasonable fears, the fears of a reasonable man, from all the circumstances that the two brothers had united, or were about to unite, in a common assault with intent to kill or maim him, and verily believed, and was authorized by the circumstances to believe, as a reasonable man, that it was necessary to shoot the deceased in order to defend himself from such joint attack. If he did so believe, and had reason so to believe, from the facts around him, then he was justifiable in shooting deceased. The doctrine of reasonable fears was properly and clearly given by the court as applicable to a contest between man and man. Precisely the same doctrine should have been given in this case, but it should have been applied to the facts of this case, where a brother ran up to the scene of a fight be-

tween his brother and another, and thus may have reasonably excited the fears of a reasonable man that he was about to be overwhelmed by the joint attack, and unless he shot, and shot quickly, life or limb would be in serious and imminent jeopardy.

We do not mean to say that the facts in the case before us make such circumstances as would excite the fears of a reasonable man that such danger threatened him. He had disarmed his first antagonist of his pistol and was shooting that. Did that antagonist have another weapon, and of what sort? Was he still in danger from that knife, if he had one, or other weapon, if he had that, or did he verily believe that he was so in danger, and were the circumstances such as to excite the fears of a reasonable man to such belief? Was the brother—the unfortunate deceased—armed, or were the circumstances such as to excite the fears of a reasonable man that he was armed? Was he approaching to take part in the contest against the accused, or was his object to induce his brother to retire and make peace? Or were the circumstances such as to excite the fears of a reasonable man that his design in running up was not peace, but war on him?

These, we think, are the points of law which would guide the jury to the true solution of this problem—to the legal verdict in this case. As they answer these questions, the verdict should be justifiable homicide, if the facts and circumstances surrounding the accused were such as to excite the fears of a reasonable man that a joint felonious assault was being made upon him; it should be voluntary manslaughter, if they were such only as to excite the fears of a reasonable man that some bodily harm, less than felony, was imminent and impending; it should be murder, if the circumstances were not such as to excite the fears of a reasonable man that he was in any serious danger at all.

Inasmuch as the law thus applicable, as we think, to the peculiar circumstances of this case was not given to the jury; as the brother who first engaged in the contest

with the accused, and brought on the entire trouble, was ignored in the charge, and thus the fact that the two brothers were on the ground together, and may have excited the fears of a reasonable man more readily than if one alone was there, was not presented at all to the jury for their consideration, we deem it our duty, notwithstanding the ability, fairness and lucidness of the charge in other respects, to reverse the judgment denying a new trial, and to direct that the case be again tried in accordance with the view hereinbefore taken of the law of this case. We do not decide or intimate what the verdict should be. The real issue of law was not submitted to the jury, and could not have been applied by them to the facts. That is all that we rule, leaving the jury to find the same, or a different verdict, as they may view the facts in the light of this law.

2. It was admissible to prove the remark of deceased as he left the store, as part of his act of going to the scene of contest.

3. With the charge to the jury in regard to their power of rejecting the dying declarations altogether, and giving to them such credit only as they would be entitled to if made in view of death, we see no error in the admissibility of the testimony, so qualified and guarded by the charge. Perhaps it would have been better to guard more clearly the words, " whether such death was approaching fast or slow." How slow? But really the facts stated by Cooper as dying declarations were merely cumulative, and perhaps the state had better dispense with them.

The other objections to the admission of evidence seem to be of little consequence ; and the verdict would not have been disturbed by us at all, but for the failure in the charge to lay down the law of the case, where the two brothers were on the scene together, as we have indicated it above.

Judgment reversed.