## MAY v. THE STATE.

1. Upon a trial for murder, the evidence being conflicting and leaving it uncertain which of the parties brought on the final conflict, there being some evidence tending to show that both were armed, that the slayer was retiring, and that the man slain advanced upon him and fired the first shot, evidence of an uncommunicated threat by the deceased to take the life of the accused was admissible and material, and its rejection is cause for a new trial.

2. Counsel for the accused, upon the sequestration of witnesses being ordered, having requested the court to allow one of the witnesses, a brother of the accused, to remain in the court-room to assist in the conduct of the defence, to which the solicitor-general objected, and the court having permitted the witness to remain upon the express announcement by counsel for the accused that they would not swear this witness in the case, the court ought not, because of these facts, to have subsequently refused to allow his introduction

for the purpose of impeaching a witness for the State. The promise implied in the announcement should not have been made, and was not obligatory.

3. Where a bill of exceptions recites that a motion for a new trial has been made, and the only error assigned is " the refusal of the court to sustain the motion and grant a new trial on each of said grounds, to wit" (the words quoted being followed by what purport to have been the several grounds of the motion, eight in number), and the bill of exceptions specifies as material the motion for a new trial, but in the transcript thereof only the first four of these grounds appear, the four remaining alleged grounds of the motion are not properly before this court for review.

February 20, 1893. By two Justices.

Criminal law. Murder. Evidence. Threat. Witness. Practice. Before Judge ROBERTS. Telfair superior court. October adjourned term, 1892.

John May was indicted for the murder of Henry Brown, and was found guilty of voluntary manslaughter. He excepted to the overruling of his motion for a new trial. The motion alleges, in addition to the general grounds, that the court erred in refusing to admit the following testimony of Daniel Spivey, a witness for the defendant: "I had a conversation with Henry Brown the day before the killing. I asked him if he had seen John May that day, that he owed me some money. He replied, ' I have not; but if John May owes you anything you had better get it, for I am going to kill him'." The other special ground is stated in the decision.

The killing occurred on a Sunday night, on the road just in front of the house of Henry Brown's mother. The defendant and Henry Brown had quarrelled in the afternoon. The Browns were sitting at the supper-table, and with them was Alex. Watson who had accompanied them home at their invitation. The defendant was heard to call from outside, and Watson went out to him. The defendant and his son Dan. May, a boy of about eighteen years, were there, both armed with guns. Henry Brown and his brother went out after Watson. As to what then occurred the evidence is in conflict.

According to the witnesses for the State, neither of the Browns had a weapon, and neither made any hostile demonstration. Henry Brown had lent his pistol to the defendant that morning. The defendant and Watson were behind a log as the Browns approached; and when the parties were about five feet apart the defendant arose, saying, " Look out Henry Brown, G—— d—— you, I am going to kill you," and then shot him down and ran; while Watson shot at the other Brown and then broke the gun over his head, knocking him senseless. When he came to the premises, the defendant spoke loudly and asked if the Brown boys and Watson had come, and on being told they had, said, " Tell them to come out here; G—— d—— them, I am going to kill them." According to the defendant's witnesses, Watson as he left the supper-table told the Browns not to go out, that he would go and get the defendant away from the place; and he went out for that purpose. He and defendant were starting off when the Browns came up. They repeatedly asked the Browns not to come there, and as they came closer the defendant told Henry Brown two or three times to stand back; but the Browns continued to advance, Henry saying, " John May, I told you I was going to kill you, and I am going to do it." Thereupon the firing commenced, and there were a number of shots, two from a pistol in the hands of Henry Brown, and in which all the cartridges but one were found to have been snapped; and five shots were fired by his brother, one of which struck Watson. One witness testified that the first shot was from a pistol, and Dan. May swore that Henry Brown fired the first shot. The defendant claimed to be going to a saw-mill to feed some oxen belonging to one Yawn who had hired him to do so, and Watson testified that he had induced him to return home, promising to feed them for him. The saw-mill was about two hundred yards from the Brown

house, though it was not necessary for the defendant to go by the house in order to reach there. Dan May testified that defendant said, when he called, that he wanted Henry Brown to come out and make friends. According to some of the testimony, the cause of the quarrel between Henry Brown and the defendant was that the latter had obtained the work of feeding the oxen. Brown claimed that defendant had undermined him in so doing, and prevented him from getting the job. As to the previous difficulty also the evidence is conflicting. Watson testified that he and the Browns left Yawn's that afternoon, and were overtaken by the defendant; that the Browns had been shooting, and defendant told them the ladies had asked him to stop them from shooting, to which Henry Brown replied that defendant had nothing to do with it, and that he had undermined him in a job. He cursed defendant, and said he was not done with him, and that defendant had to give him satisfaction. He ran his hand back to his pistol-pocket and said, "I can kill you quicker than hell can scorch a feather." Watson separated them, and the defendant went towards home, Brown calling after him, "John May, if you come to Elvin Yawn's lot in the morning, G—— d—— you, I will kill you," and started to follow, but was stopped by Watson. The defendant made no reply. A witness for the State testified that he saw the parties that afternoon together, and they appeared friendly, but afterwards they commenced cursing each other, and Brown said to defendant, "I'll whip hell out of you," to which the defendant replied, "No, I'll be d——d if you do. I'll go home and get my gun and kill you this night; if I don't, I'll kill you in the morning at the lot." This witness also testified that he saw the defendant borrow a pistol from Henry Brown that morning, telling Brown that he was going to Chauncey to get some liquor. He returned

from Chauncey that evening. There was testimony for the defendant that, about a week before the killing, Henry Brown said to the witness that he would kill the defendant if he lived, which threat the witness communicated to the defendant the next day. ·

C. D. Loud, R. R. Norman and B. M. Frizzell, by Harrison & Peeples, for plaintiff in error.

No appearance *contra.*

Lumpkin, Justice.

1. As a general rule, upon the trial of a murder case, evidence of threats previously made by the deceased against the accused, but not communicated to the latter, is inadmissible; but this rule is by no means invariable. When the evidence leaves it doubtful as to which of the parties began the mortal combat, and there is testimony tending to show that the slayer killed his adversary in self-defence, evidence of this character may be received to show the state of mind or feeling on the part of the deceased, and thus illustrate his conduct and throw light upon his intention and purpose at the time of the fatal rencontre. This is the substance of what was ruled in the case of *Keener* v. *The State*, 18 *Ga.* 194, so often cited, and now so familiar to the profession.

In *Hoye* v. *State*, 39 *Ga.* 718, Brown, C. J., while intimating some disapprobation of the ruling in *Keener's* case, states that the court expressly declined to overrule that decision; and in *Peterson* v. *State*, 50 *Ga.* 142, McCay, J., recognizes the propriety of admitting the uncommunicated threats in the *Keener* case, although he says the court does not feel authorized to go any further in that direction. In *Vann* v. *State*, 83 *Ga.* 44, this court held that evidence as to threats made by the deceased and not communicated to the accused, was properly rejected. Justice Simmons, who delivered the opinion, does not comment upon the facts of the case in connection with this ruling, but merely cites the cases

of *Hoye* and *Peterson, supra,* and also, *Lingo* v. *State,* 29 *Ga.* 470. An examination of the facts of the *Vann* case will show, however, that Vann was the aggressor from the very beginning of the difficulty which resulted in the death of White, the man he murdered, and that the deceased was shot down and killed when he was actually walking away from the slayer and making no attempt of any kind whatever to injure him; and in each of the cases there cited on this question, it will be seen there was no overt act or attempted violence on the part of the deceased towards the accused. These cases, therefore, present no obstacle to holding that un-communicated threats may be properly received in cases of an entirely different character, such as the one now under consideration.

This subject was also dealt with by Chief Justice BLECKLEY in *Vaughn* v. *State,* 88 *Ga.* 731, where a pre-vious uncommunicated threat was held inadmissible, because the evidence was positive that the accused fired the first shot, and was not contradicted otherwise than by his own statement, and there was no evidence that the deceased was armed. See authorities therein cited, upholding the admissibility of uncommunicated threats.

In *Trice* v. *State,* 89 *Ga.* 742, 15 S. E. Rep. 648, the re-fusal of the court to permit the introduction of uncom-municated threats by the deceased against the life of the accused was held to be no cause for a new trial; but it appeared in that case that the accused, while armed with a deadly weapon, challenged the deceased to fight in the public road, and slew him as he approached with an open knife in his hand, before he had come near enough to put the accused in immediate danger, the latter doing nothing to decline the mortal combat. In such a case, even if the deceased had previously threat-ened to kill the accused, little or no additional light could thereby be thrown upon his feelings and conduct,

other than was already apparent from his acceptance of the challenge given him by the accused.

Mindful of all the previous rulings of this court on this subject, and in view of the other authorities above referred to, we are satisfied that, under the facts which appear in the reporter's statement, briefly summarized in the first head-note, we have therein ruled the true law upon this question applicable to the case at bar. If the witnesses for the State told the truth, the accused was guilty of murder; if the version of the homicide given by the witnesses for the accused is correct, the accused was justifiable, and guilty of no crime at all. In no view of the case as it appears from the record before us, could the killing have been voluntary manslaughter. Taking into consideration the conflicting accounts of the transaction, the fact that the deceased had shortly before the fatal rencontre threatened to take the life of the accused, might, under the circumstances, as illustrative of the intent and feeling on the part of the deceased and as explaining his conduct at the time of the killing, materially have aided the jury in reaching a just conclusion. While it is true that evidence of similar threats made by the deceased and communicated to the accused was admitted in evidence, this testimony came from witnesses who were evidently discredited by the jury, and the accused was entitled to have, upon the subject of threats, the evidence of another and different witness, whom the jury might have believed.

We do not wish to be understood as expressing or intimating any opinion whatever as to the real truth of this case. As it is to be again tried, we wish the jury to pass upon it unembarrassed by any suggestion from us as to the guilt or innocence of the accused. We simply desire that he should be tried according to law, and that all pertinent and legal evidence be admitted upon the next hearing.

2. The accused desired the presence of a brother in the court-room during the trial to aid in his defence. As this brother was also a witness in the case, when the court ordered the witnesses to be sequestered, counsel for the accused requested that this one be allowed to remain to assist in the conduct of the trial, and upon objection thereto being made by the solicitor-general, announced that they did not intend to introduce the brother as a witness at all. The court then gave permission for him to remain. Afterwards, in the course of the trial, counsel for the accused desired to introduce him for the purpose of impeaching a witness for the State, but the court refused to allow this to be done, assigning as a reason for such refusal that counsel had stated they would not swear this witness. We think this was error. In the first place, the court might with propriety have allowed the brother to remain without condition to assist in the defence; and though this was not done, we do not think, under the circumstances, that the promise implied in the announcement made by counsel for the accused should have been held absolutely binding. Such things are not matters of contract between court and counsel. The brother of the accused was not disqualified from testifying as a witness because of the fact that he had heard the testimony of other witnesses delivered from the stand. This court has held that even where a witness has been sworn and placed under the rule, the fact that he disobeys the order of the court, remains in the court-room and hears a portion of the testimony, will afford no reason for excluding his testimony; the misconduct of the witness does not operate to disqualify him, but simply renders him amenable to the court for contempt in disobeying its order. *Rooks* v. *State*, 65 *Ga.* 330; *Lassiter* v. *State*, 67 *Ga.* 739; *Bone* v. *State*, 86 *Ga.* 108.

3. When there is a variance between the recitals in a

bill of exceptions and the transcript of the record, the latter must prevail. *Dismuke* v. *Trammell*, 64 *Ga.* 428. In the present case, the bill of exceptions, after setting forth what purports to be a copy of the motion for a new trial containing eight grounds, specifies as material to a clear understanding of the errors complained of, the motion itself. In the transcript of the record, the motion appears to contain only four grounds, numbered, respectively, "1st," "2d," "3d," and "4th." The names of counsel for movant are signed under the fourth ground; and immediately below, is an acknowledgment of service by the solicitor-general, and the approval of the grounds of the motion by the presiding judge. In view of these facts, this court has no authentic information that the motion contained any additional grounds, and the four remaining alleged grounds are not properly before us for consideration and review. Although the judge signed the usual certificate to the bill of exceptions, and therefore certified that it was true, this does not amount to a verification of the truth and correctness of the grounds of the motion for a new trial, the motion itself being specified as material. In fact, it is expressly stated in the bill of exceptions that the judge declined to approve two of them, and there is no averment that he did or did not approve the other two. Be this as it may, it is not the office of the bill of exceptions to verify the record specified as material and ordered to be sent up. On the contrary, it is the duty of the clerk to make out the transcript and certify to its correctness. Counsel for the plaintiff in error did not themselves rely upon their own statements in the bill of exceptions as to what the motion for a new trial contained, but specified, and requested the court to order sent up, a transcript of the motion itself as it appeared of record. This order the clerk apparently obeyed, and we can only consider and pass upon the motion as cer-

tified by him, as we have done. The rulings we have made dispose of the entire case, as the only error assigned in the bill of exceptions is the refusal of the court to sustain the motion for a new trial, and we have passed upon all the grounds of the motion as it appears in the transcript of the record.        *Judgment reversed.*