WARRICK v. THE STATE.

| 125 | 133 |
| 125 | 276 |
| 126 | 576 |

| 125 | 133 |
| e127 | 689 |
| i128 | 25 |
| f128 | 28 |

| 125 | 133 |
| 130 | 301 |
| 130 | 483 |

1. On the trial of an indictment for murder, where it appeared that the deceased was at the house of one Frank Moody, that he arose from the place where he was sitting and said to another, who was present, "Let's go and get Frank's horse and buggy, and we can ride over town," and that this was said as he started to the lot in front of which the homicide occurred, and just before it took place, such a statement, accompanying the act of starting from the house, was properly admitted in evidence.

2. Where it appeared that the accused and the deceased had a quarrel prior to the fatal rencounter and on the same day, and there was some evidence tending to show that shortly before the killing took place the deceased had a pistol, and that about thirty minutes before it occurred he said, "God damn him, I will kill him," such a threat was not objectionable on the ground that it was a mere idle statement and was not a threat against the accused.

3. When uncommunicated threats by the deceased against the accused are admissible in evidence, and when not, discussed.

4. Where, after the shooting had occurred, the horse of the defendant, which was standng at the place where it happened, moved off a slight distance and was stopped by him, and he at once returned, and, some five minutes after the shooting, a person who had not been present during the transaction came up and told the accused to come on, saying that he shot the deceased, to which the accused replied, "I will tell you all about it," it was proper to reject the narrative or statement which the accused proposed to show that he had then made.

5. There was no error in rejecting the evidence of a witness that the deceased had the reputation of carrying firearms and deadly weapons on his person, there being nothing to show that this was known to the accused.

6. Where it was sought to show a general character for violence on the part of the deceased, this could not be established by proof of specific acts. Nor did the fact that certain witnesses for the defendant, who testified in regard to the character of the deceased on cross-examination, stated that they did not know of any specific acts of violence except one drunken quarrel with the accused, authorize the defendant to prove by other witnesses introduced on his behalf that they did know of certain acts of violence on the part of the deceased, such testimony not being invoked in connection with or in reply to any cross-examination of the last-mentioned witnesses.

7. In a proper case, on a trial of one indicted for murder, sections 70, 71, and 73 of the Penal Code may all be given in charge; but instructions as to the separate branches of the law of justifiable homicide should not be so given as to confuse the different defenses which may arise under those sections.

8. Where the evidence is conflicting as to whether a particular thing did or did not occur, and the presiding judge charges the jury the legal principle that the existence of a fact testified to by one positive witness is rather to be believed than that such fact did not exist because many witnesses who had the same opportunity of observation swear that they

did not see or know of its having transpired, he should also give an instruction to the effect that in weighing the testimony of witnesses the jury should consider and pass upon their credibility.

Argued February 19,—Decided March 28, 1906.

Indictment for murder. Before Judge Parker. Appling superior court. December 14, 1905.

Dozier Warrick was indicted for murder. On the trial he was found guilty of voluntary manslaughter. He made a motion for a new trial, which was overruled, and he excepted.

*W. W. Bennett* and *Kay, Bennet & Conyers*, for plaintiff in error. *John W. Bennett, solicitor-general, contra*.

LUMPKIN, J. (After stating the foregoing facts.)  1. The defendant and the deceased were both at the place of Frank Moody, the defendant having his horse and buggy. The deceased arose from where he was sitting, and said to another who was present, "Let's go and get Frank's horse and buggy, and we can ride over town." This was said as he started to the lot in front of which the homicide occurred, and just before it transpired. Objection to this evidence was made by the defendant. Such a statement, accompanying the act of starting from the house where he had been, was a part of the res gestæ, and was properly admitted. *Price v. State*, 72 *Ga.* 441; *Johnson v. State*, 72 *Ga.* 679; *Thomas v. State*, 67 *Ga.* 460.

2, 3. A witness for the defendant testified, "He [Robert Sellers, the deceased] said, 'God damn him, I will kill him,' but did not call anybody's name." The motion for a new trial alleges that counsel for the State objected to this evidence, without stating any special grounds, and that the court excluded it. It is insisted that it was admissible to show the mental condition of the deceased when it was made, some thirty minutes before the homicide, and also to illustrate the conduct and acts of the deceased at the time of the killing. The evidence disclosed that, earlier in the same day, the accused and the deceased had had a quarrel. As to what may be the actual facts we express no opinion; nor as to what witnesses the jury should believe, nor what was the truth of the case; but there was some evidence on behalf of the defendant tending to show, that, shortly before the shooting, the deceased had a pistol, although it did not appear that he had it when killed; and that about thirty minutes before it occurred, he made the threat stated above. There

was also evidence tending to show, that the deceased struck the first
blow; that in the final quarrel some opprobrious language was used,
and the deceased started towards the accused, as if for a fight, and,
after being held temporarily by a bystander, was released, and he
and the accused went together and fought; that the deceased was
decidedly the larger man, and struck the accused, knocking him
back against the buggy, and that in the fight the accused shot him.
He also sought to show that, before he fired, a shot or shots were
fired by one or more friends of the deceased who were present.
Immediately after the shooting, the evidence shows that he said he
had to do it.    Evidence of other threats by the deceased was intro-
duced.    Counsel for the State insisted that the threat was properly
excluded, on the ground, as stated in his brief, that "no threat was
made against the defendant, and the statement of the deceased, if
made at all, was a mere idle statement."    But the fact that it was
somewhat indefinite did not render it inadmissible, where it was
reasonably capable of being applied to him.    *Harris* v. *State*, 109
*Ga.* 280.    While, as stated, the specific ground on which it was re-
jected does not appear, from the argument of counsel for the de-
fendant we think it not inappropriate to discuss somewhat the law
of undisclosed threats, as it stands in this State.    On the subject
of the admissibility of uncommunicated threats against the accused
by the deceased, there has not always been perfect uniformity in
the decisions of this court.    In *Hudgins* v. *State,* 2 *Ga.* 173, it was
said: "When the question is whether a homicide is felonious or
justifiable, the opinion of a witness, as to the *intention* of the de-
ceased in approaching the prisoner, is not evidence; aliter, as to any
information which the witness may have communicated, whether
true or false."    In *Howell* v. *State, 5 Ga.* 48, it was said:  "Where
the defendant, on his trial for an assault with intent to murder, pro-
posed to ask a witness 'if he did not know that Dill [the party
assaulted] had threatened to drive the defendant from the place or
take his life,' it was  .  .  competent evidence to be submitted to the
jury for their judgment under the statute, either as a justification or
to rebut the presumption of malice."    In the opinion it is stated that
"Whether the threats of Dill, to drive the defendant from the place
or take his life, were ever brought home to the knowledge of the
defendant, the record is silent."    It was further said, that, "By the
12th section of the 4th division of the Penal Code, ·it is justifiable

homicide to kill a human being in self-defence or in defence of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either. . . . The threats of Dill, proposed to be proved by the witness, manifested an intent on his part to commit a felony on the person of the defendant." In *Monroe* v. *State,* 5 *Ga.* 86, it is said: "Threats, accompanied with occasional acts of personal violence, are admissible to justify the reasonableness of the defendant's fears, provided a knowledge of the threats is brought home to him." In *Keener* v. *State,* 18 *Ga.* 194, it was said: "When previous threats, without any overt act, are sought to be introduced by the defendant, by way of justification, it must be shown that they had been consummated [communicated?] : aliter, if used merely to show the state of mind or feeling on the part of the deceased." On page 228 it was said, in the opinion : "The true distinction, we apprehend, as to the admissibility of evidence of threats, and one apparently overlooked in many of the cases, is this: when sought to be introduced by the defendant as a justification for the homicide, and without any overt act, he must show that they have been communicated; otherwise they can furnish no excuse for his conduct; but when offered to prove a substantive fact, namely the state of feeling entertained by deceased toward the accused, it is competent testimony, whether a knowledge of the threats be brought home to the defendant or not." In *Lingo* v. *State,* 29 *Ga.* 470, it was held, that "Threats by the deceased are not admissible in evidence when they were unknown to the slayer, and where the deceased did nothing in the conflict except to defend himself." In *Hoye* v. *State,* 39 *Ga.* 718, it was held, that previous threats by the deceased that he would take the life of the accused if the latter did not pay him some money which he owed were not admissible in evidence in justification of the killing claimed to be in self-defence, where not communicated to the slayer before such killing; and that newly discovered evidence of such threats furnished no ground for a new trial. In the opinion Brown, C. J., said that such evidence was admitted in *Keener's* case, not by way of justification, but merely to show the state of mind or feeling on the part of the deceased; "but that ruling does not seem to have been followed in subsequent decisions. See 25th *Georgia,* 207, and 29th *Georgia,* 470. While we do not overrule that decision, we hold that it is not applicable

to this case. We do not see what the state of mind of the deceased had to do with the case, as the deceased was unarmed, and made no effort to hurt the prisoner further than to make threats, and put his hand in his bosom, where he had no weapon." In *Peterson* v. *State,* 50 *Ga.* 142, the evidence showed that the killing was without justification or sufficient excuse. After the defendant was convicted and a motion for a new trial had been overruled, a second motion was made, on the ground of the discovery of new evidence to prove that the deceased had, a few days before the killing, said he intended to kill the prisoner, and had borrowed a pistol, expressing such intent; but it did not appear that at the time of the killing the prisoner was informed of such threats of the deceased. It was held that this furnished no ground for a new trial. In the opinion McCay, J., said: "The *Keener* case carries the question of the admissibility of such testimony to the point of extreme liberality, and is difficult to reconcile with *Howell's* case, 5 *Georgia,* and *Monroe's* case, 5 *Georgia.* We do not feel authorized to go any further in the direction of the *Keener* case than its terms require. See *Hoye's* case, 39 *Georgia.*" In *Vann* v. *State,* 83 *Ga.* 46 (14) it was held that "Evidence as to threats made by the deceased, and not communicated to the defendant, was properly rejected." See also *Trice* v. *State,* 89 *Ga.* 742. In *Vaughn* v. *State,* 88 *Ga.* 731, it was held that where it appeared from the positive and uncontradicted evidence that the prisoner fired the first shot, a previous uncommunicated threat of the deceased that he would "do up" the accused was not admissible in evidence as tending to show that the deceased fired the first shot, there being no evidence that the deceased was armed. In the opinion it was said that the state of mind of the deceased needed no illustration if there was no conduct on his part which put the accused in real or apparent danger; and the *Keener* case was distinguished. It was also said, that, "Were the ascertainment of the attacking party dependent upon mere probability, and not put out of question by the direct evidence, an uncommunicated threat, according to many authorities, would be admissible." In *May* v. *State,* 90 *Ga.* 793, the decision in *Keener's* case was again cited as authority; previous rulings were discussed; and it was held, that, "Upon a trial for murder, the evidence being conflicting and leaving it uncertain which of the parties brought on the final conflict, there being some evidence tending to show that

both were armed, that the slayer was retiring, and that the man slain advanced upon him and fired the first shot, evidence of an uncommunicated threat by the deceased to take the life of the accused was admissible and material." In *Pittman* v. *State,* 92 *Ga.* 480, it was held that uncommunicated threats by the deceased to kill the accused, made on the same day of the homicide, were admissible, where it appeared that in the final rencounter the deceased made the first violent demonstration by raising a stick in position to strike. In *McKinney* v. *Carmack,* 119 *Ga.* 467, is contained the latest expression of this court upon the subject, and it may be considered as stating both the general rule excluding uncommunicated threats, and the exceptional instance in which they are admissible. The second headnote reads as follows: "As a general rule, evidence of threats previously made by one who is killed by another, but uncommunicated to the latter, are not admissible on the trial of a case involving the question whether or not the slayer was justified in taking the life of the deceased; but when the evidence tends to show that the person killed began the mortal conflict and that the slayer killed his adversary in self-defense, proof of threats of this character may be received to show the state of mind or feeling on the part of the deceased, and thus illustrate his conduct and throw light upon his intention and purpose at the time of the fatal rencontre. *May* v. *State,* 90 *Ga.* 797, and cases therein cited and reviewed."

In 4 Elliott on Ev. §3041, it is said: "Evidence of previous threats of the deceased against the accused is not admissible, unless there is some proof of an attack or overt hostile act showing an intent to carry the threats into execution. It has sometimes been stated, in general terms, that evidence of threats uncommunicated to the defendant is not admissible. Thus, it has been held that threats of deceased against the accused are not admissible in evidence, until it has been proved that the accused had been advised of them. · But in these cases there was no pretense of self-defense; and it is generally held that evidence of uncommunicated threats by deceased is admissible in a proper case to show his mental attitude, and determine who was the aggressor. And in a recent case it is said that uncommunicated threats, according to the modern and better reasoned cases, are admissible in three instances, namely, to show who began the affray, to corroborate evidence of communicated threats, and to show the attitude of the deceased." The evi-

dence in this case was of doubtful admissibility; but where this is so, in view of the entire case, we think it should have been admitted.

4. Error was assigned because the court rejected the evidence of a witness that the defendant said, "Frank, I will tell you all about it," the contention being that the witness would have testified further that the defendant said to Frank Hall (the person to whom the above-stated remark was directed) that he had to shoot the deceased in order to save his life from the attack that the deceased and his friends were making on him. After the shooting occurred the horse of the defendant, which was standing at the place of the rencounter, moved off, and the defendant immediately went and stopped him, and on returning said, in effect, to those around him . that he would not have done it if some of them had not shot at him, and that it would have been a fair fight, but they all knew he had to do what he did. Frank Moody (the person referred to as Frank, in the testimony offered) was not present when the shooting took place. Afterwards he came out of the house, jumped over the lot gate, went to where the deceased was, and kneeled or squatted down in front of the latter. Moody arose, went to the house, then came back, jumped over the fence, met the accused, and told him to come on, saying "You shot Robert." It was in reply to this that the statement of the accused was made which it was sought to prove. This conversation occurred very shortly after the shooting. A witness testified that five minutes had not passed.

In *Hall* v. *State,* 48 *Ga.* 607, McCay, J., said: "The res gestæ of a transaction is what is done during the progress of it, or so nearly upon the actual occurrence as fairly to be treated as cotemporaneous with it. No precise point of time can be fixed a priori where the res gestæ ends. Each case turns on its own circumstances. Indeed, the inquiry is rather into events than into the precise time which has elapsed." In the apt and often-quoted language of Chief Justice Bleckley, in *Travelers' Ins. Co.* v. *Sheppard,* 85 *Ga.* 775, "What the law altogether distrusts it not afterspeech but after-thought." Tested by these rules, we think that the proposed evidence was not free from the suspicion of afterthought, but rather in the nature of a narration of a past transaction, by which the accused proposed to exculpate himself, than a part of the res gestæ. In *Mitchum* v. *State,* 11 *Ga.* 615, the accused ran from the house where the deceased was shot, a distance of thirty

or forty yards, to where the witness was. He seemed to be greatly agitated and troubled, and, at the moment of coming up to the witness, exclaimed that he would not have done it for the world. This was within about one minute from the firing. It was held to be admissible. A comparison of the facts of that case with those here involved will show the difference. In *Thomas* v. *State, 27 Ga.* 287, the accused said, as he turned and was leaving the place, about a minute or a minute and a half after he had shot the deceased, that he wanted the witness to protect him, and that he had done nothing but what he was compelled to do in self-defense. This was a voluntary statement very closely connected with the transaction, and was not a proposition to narrate to a witness who was not present the details of a rencounter which was already over, and had been so for some five minutes. In *Futch* v. *State, 90 Ga.* 478, the declarations of a witness, made within a minute of the time of the shooting, when she ran into the house from the scene where it occurred, were held inadmissible, the court giving weight to the manner in which they were made. In *Thornton* v. *State, 107 Ga.* 683, it was held that on the trial of a defendant for the murder of his wife, his declaration, that "he had tried to care for his wife but that she had forced him to do what he had done," was not admissible in evidence in his behalf, though made in a half-minute after the commission of the crime, it appearing that such statement was made to one in his house, where he had gone after he had left the scene of the killing, and the circumstances not indicating that the statement was free from the suspicion of afterthought. An examination of the facts in other cases where declarations have been held to be part of the res gestæ will show that they differ from those here involved. See *Monday* v. *State, 32 Ga.* 672; *O'Shields* v. *State, 55 Ga.* 697.

5. There was no error in rejecting evidence that the deceased "had the reputation of carrying firearms and deadly weapons on his person," there being nothing to show that this was known to the accused. Where the general character of the deceased is admissible, it may be proved by reputation, but particular acts can not be so proved. It has been held that evidence that the deceased in fact habitually and notoriously carried deadly weapons, and that this was known to the accused, was admissible. *Daniel* v. *State, 103*

*Ga.* 202. But reputation that he carried weapons, unknown to the accused, would not be so.

6. Where it was sought to show a general character for violence on the part of the deceased, this could not be established by proof of specific acts. *Doyal* v. *State,* 70 *Ga.* 134. Nor did the fact that, on cross-examination, certain witnesses for the defendant testified that they did not know of the deceased having ever committed any specific acts of violence, except when he got into a drunken quarrel with the accused, authorize the defendant to prove by other witnesses introduced on his behalf that they knew of certain other specific acts of violence on the part of the deceased.

7. Section 73 of the Penal Code does not qualify or limit the law of justifiable homicide as laid down in sections 70 and 71. In *Teasley* v. *State,* 104 *Ga.* 738, it was said: "The section first mentioned [§ 73] applies exclusively to cases of self-defense from danger to life arising during the progress of a fight wherein both parties had been at fault. The other two sections are applicable when the homicide is committed in good faith to prevent the perpetration of any of the offenses mentioned in section 70, or under the fears of a reasonable man that such an offense will be perpetrated unless the person who is actually, or apparently, about to commit it be slain. Instructions as to these two separate branches of the law of justifiable homicide should not be so given as to confuse the one with the other." *Pugh* v. *State,* 114 *Ga.* 16; *Jordan* v. *State,* 117 *Ga.* 405; *Smith* v. *State,* 119 *Ga.* 564. In the present case the court charged sections 70, 71, and 73 of the Penal Code in immediate sequence. He did then add that an apparent necessity, acted upon bona fide, is the same as a real necessity, and gave some instances in which this might be true. But we can not feel sure that a jury might not have been confused by the context in which they were given. In view of the entire charge on this subject, perhaps a new trial would not have been required by this ground alone. In a proper case all of these sections may be given in charge, but this should be done so as not to confuse the jury or make them all applicable to the same theory or state of facts.

8. It is error to charge without qualification that positive evidence is stronger than negative, or in similar language. In *Southern Ry. Co.* v. *O'Bryan,* 115 *Ga.* 659, the first headnote reads as follows: "A charge to the effect that the testimony of a witness

testifying positively is entitled to more weight than that of one who testifies negatively is open to serious criticism unless it embraces an instruction that the jury, in weighing the testimony of such witnesses, should consider and pass upon the question of their credibility." See also *Southern Ry. Co.* v. *O'Bryan,* 119 *Ga.* 148; *Minor* v. *State,* 120 *Ga.* 490; *Cowart* v. *State,* 120 *Ga.* 510. It has been suggested that this has the somewhat apparently singular result of reversing a judge who charges a section of the code and stops. (Penal Code, § 985.) But the profession will readily understand that the former decisions referred to above did not hold that there was any error in charging the section of the code in proper cases; but that, in cases of conflicting evidence, it should be accompanied by an additional charge touching the credibility of witnesses. *Welborn* v. *State,* 116 *Ga.* 522, 523; *Innis* v. *State,* 42 *Ga.* 473. Similar to this is the rule that the contention of one side may be correctly stated, but it should not stand entirely alone; and the law bearing only on one side of the issue should not be given and that touching the other entirely ignored. In weighing evidence, its character as to being positive or negative is one element for consideration, but it is not the only one. Credibility is also essentially involved. The section of the code does not mean that the jury is bound to believe the positive evidence of one whose credibility is little or nothing, or who may have been successfully impeached or shown to be a perjurer, in preference to the evidence of many honest, upright witnesses of unquestionable credibility who had equal opportunity of observation, though their testimony may be negative. The rule does not mean that a witness must be credited, regardless of anything else, if he swears positively. If so, hard swearing would necessarily import truth. The rule as to positive and negative evidence has reference to the nature of the evidence; but the jury consider not only what a witness swears, but also what credit is to be given to him as a witness.

<div style="text-align: right">

*Judgment reversed. All the Justices concur.*